IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2026 Session

## STATE OF TENNESSEE v. JENNIFER LEIGH SEXTON

**Appeal from the Criminal Court for Knox County**
**No. 120353   G. Scott Green, Judge**

_____

### No. E2024-01729-CCA-R3-CD

_____

The Defendant, Jennifer Leigh Sexton, was convicted in the Knox County Criminal Court of vehicular homicide by recklessness, a Class C felony; initiating a false report, a Class D felony; driving on a suspended license, a Class B misdemeanor; and following too closely, a Class C misdemeanor, and received an effective sentence of ten years in confinement. On appeal, the Defendant claims that (1) the trial court abused its discretion by admitting testimony from the State's expert because the expert's method of data collection was unreliable, (2) the trial court erred by failing to provide the Defendant's requested special jury instructions, and (3) the evidence is insufficient to support the conviction of initiating a false report. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN W. SWORD, JJ., joined.

Tyler M. Caviness, Knoxville, Tennessee, for the appellant, Jennifer Leigh Sexton.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean D. Bright and Amelia Hamilton, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In December 2021, the Knox County Grand Jury returned a four-count presentment charging the Defendant with vehicular homicide by recklessness in the death of Gary Rosen in count one, initiating a false report in count two, following too closely in count three, and

driving on a suspended license in count four. The Defendant went to trial in May 2024. After the State's reading of the presentment but prior to opening statements, the Defendant, through her attorney, pled guilty to driving on a suspended license. She proceeded to trial on the remaining counts.

Wesley Swaggerty testified that in the early morning hours of June 15, 2021, he was driving a semi-truck westbound in the far-right lane on Interstate 40 in Knox County, near the Strawberry Plains Pike exit. As he approached the Holston River bridge, he saw brake lights illuminate on a car traveling ahead of him. He then saw smoke and sparks. Mr. Swaggerty thought the car had a "blowout," so he moved his truck into the middle lane. As his truck approached the car, Mr. Swaggerty saw an object in the middle lane. He later learned the object was a body. Mr. Swaggerty's truck was equipped with a video camera, and the State played the video. The State stopped the video just before Mr. Swaggerty's truck drove over the victim. The time on the video was 5:15 a.m.

Wayne Nelson testified that on the morning of June 15, 2021, he was driving a semi-truck westbound in the far-right lane on Interstate 40 and noticed flashing hazard lights on a car ahead of him. The car appeared to be stopped on the right shoulder of the interstate. However, as Mr. Nelson's truck approached the car, he realized the car was stopped in the far-right lane. Mr. Nelson was unable to change lanes due to vehicles to his left and had to make an emergency stop about twenty feet behind the car. He got out of his semi-truck and saw a woman standing outside the car's passenger door. Mr. Nelson yelled for her to get out of the roadway, handed her a safety vest, and began waving vehicles around his truck. He did not have any further interaction with the woman but spoke with multiple officers who arrived on the scene.

Michael Black testified that in June 2021, he was a patrol officer with the Knoxville Police Department ("KPD"). About 5:20 a.m. on June 15, he responded to a crash on Interstate 40 near the Holston River bridge. He was one of the first officers to arrive and saw a semi-truck, a Volkswagen sedan, and a motorcycle. The crash involved the Volkswagen and the motorcycle. The driver's door of the Volkswagen was closed, and the driver's window was rolled up. Officer Black spoke with the semi-truck driver and then spoke with the Defendant. The Defendant claimed her boyfriend, "Corey Huffaker," had been driving the Volkswagen at the time of the crash.

Officer Black testified that the Defendant appeared "shaken a little bit." He told her to telephone Mr. Huffaker, but she did not do so. The Defendant provided Officer Black with a description of Mr. Huffaker, and Officer Black relayed the description to dispatch. Police officers also canvassed the area for Mr. Huffaker.

Officer Black testified that he was unable to find any record of a "Corey Huffaker," which was "pretty common when people will give us a fake name and birthday." The Defendant was transported to a hospital, and Officer Black confiscated her cellular telephone.

Officer Black testified that he did not administer field sobriety tests to the Defendant at the scene or request a blood draw. The State asked him to explain why her blood was not collected, and he stated,

> So at the time -- at the time we weren't sure if she was the driver or not. It's not uncommon for people to be involved in wrecks and take off running. So at the time, I don't think we had the probable cause or reasonable suspicion enough to put her in that driver's seat.

Officer Black acknowledged that he was wearing a body camera at the crash scene, and the State played a redacted version of his video. The video showed Officer Black approaching the four-door Volkswagen at 5:32 a.m. Both passenger doors were open, and the Defendant was sitting in the rear passenger seat. Officer Black asked her, "What's up? Where's your boyfriend?" The Defendant said she did not know "where he went to," and Officer Black asked, "Why'd he take off?" The Defendant responded, "Probably because he doesn't have a driver's license." Officer Black asked, "You think I'm worried about a driver's license right now?" She answered, "I don't think so, but I didn't even know what he even hit until just now." Officer Black told the Defendant to "call him and tell him to get his ass back here." The Defendant picked up her cellular telephone and appeared to scroll down the screen. Officer Black asked for her boyfriend's name, and she responded, "Corey Huffaker." She spelled his first name, C-O-R-E-Y, for the officer and held her telephone to her ear. Officer Black asked for Mr. Huffaker's birthday, and the Defendant responded, "June 16th 87." She said she had known him for about two weeks. She put down her telephone and said the call was "going to voicemail." The Defendant described Mr. Huffaker as "a white guy" and said he was wearing a baseball cap, a black and red t-shirt, and blue jeans. She said he fled on foot. Officer Black asked if Mr. Huffaker was "drunk" or had been "drinking." The Defendant said that he was not intoxicated but that he consumed about eight beers "over the course of the night." She said she did not see Mr. Huffaker hit the motorcycle because she had bent down to get something out of her purse. About ten minutes later, Officer Black advised the Defendant that he could not locate any information for "Corey Huffaker" and accused her of lying about her boyfriend's name. The Defendant said she was not lying but changed her story. She claimed she did not see Mr. Huffaker hit the motorcycle because she and Mr. Huffaker were arguing and fighting at the time of the crash. She said that Mr. Huffaker was trying to hit her and that she lied to Officer Black because she was embarrassed.

- 3 -

Officer Samuel Young of the KPD, an expert in accident reconstruction and data collection, testified that he responded to the scene. It was dark outside when the collision occurred, but daylight when he arrived. The westbound side of the interstate was composed of three lanes. He said that the weather was clear, that the pavement was dry, and that the quality of the pavement was "good." Regarding the curvature of the interstate, Officer Young stated, "East of the crash scene, there is a curve that curves to the right. And then the roadway is a gradual climb that is straight at that point." He estimated that a motorist could see at least one hundred yards. The speed limit was sixty-five miles per hour, but it had just decreased from seventy miles per hour.

Officer Young testified that a dismembered body was lying on the roadway. From his inspection of the scene, he concluded that the Volkswagen had hit the rear of the motorcycle, which had knocked the victim off the bike. Several vehicles, including a couple of semi-trucks, ran over the victim. The Volkswagen was registered to the Defendant, and the tires on both vehicles were in "good" condition. Officer Young did not think the Volkswagen was equipped with a forensic computer, also known as a "black box." The motorcycle came to rest in an upright position with its rear tire in the front bumper of the Volkswagen. Officer Young said he had never seen another collision, before or since, in which a motorcycle was "stuck" upright in a car's bumper. The impact pushed back the front fender of the Volkswagen, "jamming" the driver's door. The door was closed and could not be opened without significant force.

Officer Young testified that he saw a black skid mark on the pavement from the motorcycle. He saw a "break" and then a second black skid mark from the motorcycle. At some point in the second skid mark, a black tire mark from the Volkswagen appeared on the pavement. From the tire marks, Officer Young deduced as follows: The Volkswagen's front bumper hit the motorcycle's rear tire, which caused the tire to stop spinning and created the first skid mark. The vehicles separated, which caused the break or gap in the skid marks. The Volkswagen's front bumper hit the motorcycle's rear tire a second time. The impact caused the motorcycle's rear tire to stop spinning again and caused the second black skid mark. As the motorcycle's rear tire was skidding on the pavement, the Volkswagen's left-front tire began leaving a black mark on the pavement. Officer Young said he could not say definitively that the tire mark from the Volkswagen was a skid mark. He measured the length of the three black marks and the break and prepared a scale diagram of the scene. The State introduced the diagram into evidence.

Officer Young testified that during the Defendant's interview with police, she said she had been at an Exxon gas station and had spoken with the night manager before the crash. She said she telephoned the night manager after the crash. Officer Young went to the Exxon and spoke with the night manager.

- 4 -

On cross-examination, Officer Young acknowledged that he prepared a crash report and a crash summary. He did not say in either document that the Volkswagen struck the motorcycle twice. The victim's motorcycle was black, and the victim was wearing a black helmet and a black leather riding jacket. The Volkswagen's airbags did not deploy. Officer Young viewed surveillance video from the Exxon gas station, and the video showed the Defendant inside the convenience store about thirty minutes before the crash. Officer Young was unable to obtain the video.

On redirect-examination, Officer Young testified that the crash scene was unusual in that the motorcycle left two separate skid marks on the pavement and came to rest in an upright position in the car's front bumper. Due to the unusual circumstances, the State retained a second accident reconstruction expert to investigate the crash.

Robert Dale Farmer, an expert in accident reconstruction and human factors, testified that the State retained him in December 2022. He reviewed crash scene photographs, vehicle inspections, Officer Young's scale diagram, witness statements, and video, and concluded that the westbound Volkswagen, which was being driven by the Defendant in the far-right lane, overtook and struck the rear of the motorcycle. Mr. Farmer said that in order to determine the Volkswagen's speed at the time of the collision, he first had to obtain the friction value of the roadway. Regarding friction value, he explained, "The higher the friction value, the stickier the roadway surface, which means the vehicle will stop quicker." To obtain the friction value, he used a device known as a drag sled.

Mr. Farmer testified that he built his drag sled himself in 1994 as part of a basic collision course. He identified photographs of his drag sled and described the design of the device as follows:

> It's made out of a metal, 50 caliber ammunition can. I purchased it at an army surplus store. On the bottom of it is a piece of tire that has been mounted to the bottom of the sled and turned up on the front so it will actually . . . pull easy. And there is an eye bolt in the corner of it near the center of it so I can pull -- whenever I pull it with a set of [spring] scales, I'm pulling through the center mass.

The set of spring scales attached to the ammunition box measured the force needed to pull the drag sled along the surface of the roadway.

Mr. Farmer testified that he had been trained in the use of drag sleds and that pulling a drag sled on a surface was an accepted method to calculate the surface's friction value in the field of accident reconstruction. However, if pulled incorrectly or on a non-level surface, the drag sled would return an erroneous result. Mr. Farmer said he usually

conducted five to ten pulls alongside tire marks to obtain the average force needed to pull the drag sled. He then divided the average force by the drag sled's weight to calculate the friction value of the surface. Mr. Farmer said that he had compared friction values obtained with his drag sled to friction values obtained with other methods and that his results were usually within two to four percent of the results obtained with other methods. He also had compared vehicle speeds he calculated with his drag sled to vehicle speeds obtained by radar. He said his speeds were usually "slightly lower, within one to two mile[s] an hour lower than what the radar speed would be."

Mr. Farmer testified that by the time the State hired him, the Volkswagen's and motorcycle's tire marks were no longer present. Therefore, he had to use the measurements provided on Officer Young's scale diagram. Mr. Farmer went to the scene and pulled his drag sled in the far-right lane of the interstate, which was the lane in which the crash occurred. He used his drag sled, as opposed to other data collection methods such as a Vericom computer with an exemplar vehicle, for safety reasons and due to the interstate's high traffic volume and not being able to find an exemplar vehicle. He described a Vericom computer as "an electronic computer you mount into a vehicle and it calculates with the tilt sensors, helps calculate the distance traveled at the time, which will develop a friction value." Unlike a Vericom computer, the drag sled allowed him to collect his data quickly without shutting down the interstate.

Mr. Farmer testified that the motorcycle's first skid mark was fifteen feet in length. The motorcycle's second skid mark was one hundred forty-five feet in length, and the gap between the first and second skid marks was twenty feet in length. While the motorcycle tire was creating the second skid mark, the Volkswagen's left-front tire began leaving a mark on the pavement due to the extra weight of the motorcycle. The Volkswagen's tire mark extended two hundred eighty-seven feet. Therefore, the total length of the tire marks, from the beginning of the motorcycle's first skid mark to the end of the Volkswagen's tire mark, was about four hundred feet. Mr. Farmer said he concluded from the "almost perfectly straight" tire marks that the Volkswagen's antilock brakes engaged and functioned properly. The victim never applied the motorcycle's brakes.

Mr. Farmer testified that he conducted four pulls with his drag sled and obtained an average pull force of thirty-three pounds. He divided the average pull force by the weight of the drag sled and calculated a friction value of .7857. Based on the friction value and various other factors, including the length of the tire marks and the braking percentages of the vehicles, he calculated that the Volkswagen was traveling eighty-seven miles per hour when it first struck the motorcycle. He was unable to calculate the motorcycle's speed.

Mr. Farmer acknowledged that the defense's expert, James Norris, calculated a lower speed for the Volkswagen. Mr. Norris calculated a different speed because he used

a different method to obtain the friction value of the asphalt roadway. Specifically, Mr. Norris used published data on friction values. The State asked which method of data collection was "better," and Mr. Farmer stated,

> I would rather take the friction values myself to try to get it at the -- at the particular roadway because the roadway surface could be different. If it's -- if you get the friction value, the quicker you can get it, the more accurate you're going to have your calculations. The published data could be off of a different composition of the asphalt roadway or the concrete roadway, say for instance, in Wyoming then it would be here in Tennessee. That's a possibility. So by doing it -- going out to the scene and actually taking it, I feel like I get better, more accurate results.

Mr. Farmer testified that another reason he and Mr. Norris calculated different speeds was that they made different assumptions about the respective braking resistances of the vehicles. Mr. Farmer assumed that all four tires on the Volkswagen produced one hundred percent braking resistance; Mr. Norris assumed that the Volkswagen's left front tire produced one hundred percent braking resistance, but that the remaining three tires produced eighty to ninety percent braking resistance. Mr. Farmer said he disagreed with Mr. Norris's braking assumptions. He explained, "[A]s I said earlier, the vehicles slid in a straight line. And if there's -- had been a lot of braking issues with it, . . . the tire marks would have been rotated. They would have been kind of a curved mark." Nevertheless, Mr. Farmer recalculated the Volkswagen's speed using Mr. Norris's braking assumptions so that their speed calculations for the Volkswagen would be more comparable. When Mr. Farmer did so, he calculated the Volkswagen's speed as seventy-eight to eighty miles per hour at impact. Mr. Farmer said he still thought, in his professional opinion, that the Volkswagen was traveling at least eighty-seven miles per hour at impact. Mr. Farmer did not consider any human factors in his analysis.

On cross-examination, Mr. Farmer acknowledged that he issued an original report in which he concluded that the Volkswagen was traveling eighty-seven miles per hour at the time of impact. After he reviewed Mr. Norris's report, he revisited his calculations and factored in eighty to ninety percent braking resistance for three of the Volkswagen's tires. He also factored in the rolling resistance for the motorcycle's front tire. He said he did not consider any resistance for the motorcycle's front tire in his original calculations because he did not know whether the front tire remained on the ground. Mr. Farmer's new speed calculation decreased from eighty-seven miles per hour to a range of seventy-eight to eighty miles per hour. Therefore, Mr. Farmer issued a supplemental report in which he ultimately concluded that the Volkswagen was traveling seventy-eight to eighty-seven miles per hour when it first struck the motorcycle.

Mr. Farmer acknowledged that the friction value, also known as the coefficient of friction, was the most important factor in his calculation of the Volkswagen's speed because the friction value formed the basis for all of his remaining calculations. He also acknowledged that in order to obtain an accurate friction value, he had to pull his drag sled correctly on the roadway. He said that he replaced the rubber tire on his drag sled five or six years before the trial and that he obtained the spring scale for his drag sled at a hunting and sporting goods store in Kingsport. The scale was designed for hunters to weigh deer.

Mr. Farmer testified that he collected his data with his drag sled on February 21, 2023, and that he was "in and out of traffic" at the scene for about thirty minutes. He weighed his drag sled that day, and it weighed forty-two pounds. He acknowledged that a drag sled was not the best method for obtaining friction value; the best method was a Vericom computer mounted inside an exemplar vehicle. Mr. Farmer owned a Vericom computer, but he would have had to close at least two lanes of the heavily-traveled interstate for ten to fifteen minutes. Additionally, he could not find a 2007 Volkswagen Jetta to use as an exemplar vehicle.

Mr. Farmer acknowledged "disagreement" in the accident reconstruction community regarding the use of drag sleds. He stated, "It depends on who you talk with. Some groups say the drag sleds are no good. Other groups say drag sleds, if used correctly, result in -- give you good results." He said that about fifty percent of peer reviewed publications considered drag sleds to be a reliable method for obtaining friction value. When Mr. Farmer began his training in accident reconstruction in 1994, drag sleds were a widely-accepted method for obtaining friction value. In 1990, Lynn Fricke, considered an expert in accident reconstruction, reported in his well-respected book *Traffic and Accident Reconstruction* that the use of drag sleds was "often criticized" because drag sleds generally resulted in greater friction values and, therefore, greater speed calculations. In 2010, Mr. Fricke reported in an updated edition of his book that the use of drag sleds was not recommended. Mr. Farmer attached excerpts from Mr. Fricke's 1990 book to Mr. Farmer's original report while Mr. Norris attached excerpts Mr. Fricke's 2010 book to Mr. Norris's report. In 2006, the Society of Automotive Engineers ("SAE"), an international organization that published recommendations and guidelines for accident reconstruction, stopped recommending drag sleds as a method for obtaining friction value. In 2019, the Institute of Police Technology and Management published a book about traffic crash investigation, in which the Institute cautioned against the use of drag sleds.

On redirect-examination, Mr. Farmer acknowledged that although Mr. Fricke's books were considered "Bibles" in the field of accident reconstruction, other well-respected publications approved of the use of drag sleds to obtain friction value. Mr. Farmer said that he had compared friction values obtained with his drag sled to friction values obtained with other methods "[s]everal hundred times" and that his drag sled always

produced friction values "a little bit lower" than friction values obtained with a Vericom computer. Moreover, the speeds calculated with his drag sled were one or two miles per hour slower than the speeds shown by radar.

Billy Brooks testified that he was incarcerated for sale and delivery of a Schedule II controlled substance. In June 2021, Mr. Brooks was an assistant manager at the Exxon gas station on Strawberry Plains Pike, near Interstate 40. He worked the third shift from 10:00 p.m. to 6:00 a.m. and knew the Defendant because she came into the store every morning. On June 14, Mr. Brooks arrived at work at 10:00 p.m. and saw the Defendant asleep in her car. He next saw her when she came into the store at 4:30 a.m. The Defendant was inside the store for about thirty minutes. Mr. Brooks said that he talked with her and that she "acted fine." Mr. Brooks, referring to the Defendant's being asleep in her car, asked her, "[Y]ou was out, wasn't you?" The Defendant responded that she "felt like [she'd] been going for a couple of days" and that she "needed a nap." The Defendant bought chocolate milk, coffee, and doughnuts and went outside to smoke a cigarette. Mr. Brooks also went outside to smoke. He saw the Defendant drive out of the parking lot about 5:00 a.m. The Defendant was traveling toward the interstate, and Mr. Brooks assumed she was driving to the McDonalds across the street.

Mr. Brooks testified that about twenty minutes later, the Defendant telephoned him. She was crying and scared, and Mr. Brooks heard sirens in the background. He said the Defendant stated that she "just had a wreck" and that "he came out of nowhere." The Defendant told Mr. Brooks that she did not know what happened and that she thought the victim was dead. Mr. Brooks tried to calm her and gave her the name "Corey Huffaker." Mr. Brooks explained to the jury that he knew someone in high school named "Corey Huffaker" and that Mr. Huffaker later changed his last name.

On cross-examination, Mr. Brooks testified that he did not want to testify against the Defendant but was under subpoena. He acknowledged that during his telephone conversation with the Defendant, she asked what she should do. Mr. Brooks told her to give Corey Huffaker's name to the police. He said doing so was a "spur of the moment thing" because the Defendant was "freaking out."

Detective Anthony DeLalla of the KPD testified that he was a forgery and fraud investigator and that he conducted cellular telephone extractions "on occasion." After the crash, Detective DeLalla assisted with the Defendant's interview at the police department. The Defendant consented to a search of her cellular telephone, so Detective DeLalla used Cellebrite software to extract data from the telephone. The extraction revealed that the telephone did not have a stored contact for anyone named "Corey Huffaker." The extraction also produced a call log for June 14 and 15, 2021. The log showed that a call was placed to a contact named "'my dude Billy'" at 5:21 a.m. on June 15, 2021. The

duration of the call was five minutes. A subsequent call was placed to a contact named "Claude", but the call was not answered. On cross-examination, Detective DeLalla acknowledged that the call log showed no activity for the telephone between 6:38 p.m. on June 14 and 2:25 a.m. on June 15, 2021.

Sergeant Preston Willock of the KPD testified that he assisted with the Defendant's interview at the police department on June 15, 2021. The interview began at 11:22 a.m. after the Defendant's visit to the hospital. When the interview began, Sergeant Willock knew only that the Defendant might have been the driver of a vehicle that was involved in a fatal collision with a motorcyclist.

The Defendant's interview was video-recorded, and the State played a redacted version of the recording for the jury. During her interview, the Defendant maintained that "Corey Huffaker" was driving the Volkswagen and that she was bending down at the time of the crash because he was trying to hit her. She stated that she heard a "huge boom" and "screeching" when the Volkswagen hit the motorcycle and that Mr. Huffaker finally brought the car to a stop. She claimed that he told her to run, that he jumped out of the driver's side, and that he ran away. Sergeant Willock advised the Defendant that the driver's door of the Volkswagen was jammed and would not open. The Defendant said Mr. Huffaker might have climbed out of the driver's window because he did not climb over her to get out of the car. The officers told the Defendant that the driver's window was rolled up when law enforcement arrived on the scene. The officers were skeptical of the Defendant's story and repeatedly confronted her with the fact that they could not find any information for "Corey Huffaker." The Defendant never admitted to being the driver.

Eileen Deveau of Arlington, Virginia, testified that she and the victim were married for forty-one years. She identified a photograph of him, and the State introduced the photograph into evidence. On cross-examination, Ms. Deveau testified that she and the victim finalized their divorce eight days before he was killed. At the conclusion of Ms. Deveau's testimony, the State rested its case.

James Edward Norris, II, an expert in accident reconstruction and human factors, testified that he analyzed the evidence in this case and calculated the Volkswagen's speed. He concluded that the Volkswagen was traveling sixty-three to seventy-five miles per hour when it collided with the motorcycle. He said he disagreed with Mr. Farmer's analysis in two respects: Mr. Farmer's use of a drag sled to obtain the friction value of the roadway and some of Mr. Farmer's calculations in determining the Volkswagen's speed.

Mr. Norris testified that he identified two stages of the crash. In the first stage, only the motorcycle's rear tire was skidding. In the second stage, the tires on both vehicles were skidding. Each stage generated its own set of calculations. Mr. Norris concluded that when

the Volkswagen first struck the motorcycle, the two vehicles "became kind of tangled together due to the damage" and "pretty much stayed together" until they came to rest. Because the motorcycle was "lodged" in the Volkswagen's front grill, Mr. Norris opined that their speeds were "relatively close" when they collided. He said that by "relatively close," he meant "within 10 miles an hour of each other or so." Otherwise, the Volkswagen would have pushed the motorcycle ahead, and both vehicles would have sustained more damage from the impact. The speed limit on the interstate changed from seventy to sixty-five miles per hour just eight feet before the Volkswagen struck the motorcycle. Mr. Norris said that, assuming the motorcycle was traveling sixty-five or seventy miles per hour at the time of impact, the Volkswagen could not have been traveling eighty-seven miles per hour when it struck the motorcycle.

Regarding Mr. Farmer's use of a drag sled to determine the friction value of the roadway, Mr. Norris testified that the accident reconstruction community no longer considered drag sleds an appropriate method for obtaining friction value. He explained,

> [A] drag sled, which a lot of times is just a literal piece of a tire cut out and filled with concrete or some sort of ballast and pulled across is just not truly representative of a skidding tire. Pulling a 40-pound object across a surface at a two or three mile an hour pull is not like a skidding full tire vehicle at 70 miles an hour.
>
> Drag sleds, they don't heat up. [They] don't shed rubber. They don't deform and have different air pressure readings. They're full of concrete. So it's kind of a rigid object. It just doesn't match the dynamic characteristics of a vehicle. And that's basically what all of these studies have realized and come to the conclusion and ultimately have recommended to not use [drag sleds] as a procedure to get friction.

Mr. Fricke's accident reconstruction books and the SAE advised against using drag sleds, and the SAE recommended obtaining friction value from a Vericom computer or published data. Mr. Norris said he "wholeheartedly disagreed" with Mr. Farmer's estimate that fifty percent of publications considered drag sleds a reliable method for obtaining friction value. He estimated that ninety percent of publications opposed the use of drag sleds.

Defense counsel showed photographs of Mr. Farmer's drag sled to Mr. Norris. Mr. Norris acknowledged that Mr. Farmer's drag sled was "[r]udimentary." He noted that the piece of tire, or contact patch, mounted to the ammunition box was "just a big rectangle" and was not curved like a tire. He said that Mr. Farmer's spring scale appeared "fairly old" and that he questioned whether the scale had been calibrated recently. He also questioned

whether Mr. Farmer was "a little rushed" while using the drag sled at the scene because Mr. Farmer described having to collect his data while trying to watch for traffic.

Mr. Norris testified that Mr. Farmer's use of the drag sled resulted in a friction value that was greater than the top of the range for friction values in published data. Specifically, published data showed the friction value for asphalt to be .55 to .7, and Mr. Farmer calculated a friction value of .7857. Additionally, Mr. Farmer misapplied the friction value to all four of the Volkswagen's tires when only the left-front tire was locked in the second stage of the crash. Mr. Farmer also calculated a definite speed rather than a range of speed for the Volkswagen. Mr. Norris said that many accident reconstructionists calculated a range of speed to account for variations in the condition of a vehicle's tires and brakes.

Mr. Norris testified that Mr. Farmer's use of the drag sled was the main reason Mr. Farmer calculated a greater speed for the Volkswagen than Mr. Norris. Mr. Farmer then compounded the error by applying the same friction value on all of the tires. Mr. Norris said he was not convinced that the Volkswagen's antilock brakes engaged during the crash because the Defendant may have maintained steering control of the Volkswagen on the straight and flat roadway, which would explain why the vehicles' skid marks were straight, not curved.

Defense counsel asked Mr. Norris to explain how "human factors" played a role in motor vehicle crashes. Mr. Norris said human factors "primarily focused on driver perception or reaction and then like avoidance maneuvers, things like that." In this case, the collision occurred at a time of day when traffic was not heavy. The crash occurred while it was dark outside and in an area of the interstate that did not have streetlights. The lack of streetlights and traffic, which normally provide contextual clues to a driver, could cause a driver not to realize that the driver was closing in on another vehicle. Likewise, a motorcycle's having only one taillight, as opposed to two taillights on a car, could reduce a driver's ability to perceive that the driver was closing in on the motorcycle.

On cross-examination, Mr. Norris acknowledged that the weather was clear at the time of the collision and that the section of the interstate where the collision occurred was relatively straight with a slight uphill grade. Mr. Norris went to the scene of the crash but did not perform any friction tests on the roadway.

After Mr. Norris's testimony, the defense rested its case. The State asserted in closing argument that the Defendant's reckless conduct, as required for vehicular homicide, was demonstrated by her driving at least eighty-seven miles per hour in a sixty-five-mile-per-hour zone; her lack of sleep; and her not seeing the victim's motorcycle on the straight roadway in clear weather, which supported her claim to police that her head was down at the time of the crash. After deliberations, the jury convicted her as charged in the

presentment. The trial court conducted a sentencing hearing and sentenced her to six years for vehicular homicide, a Class C felony; four years for initiating a false report, a Class D felony; six months for driving on a suspended license, a Class B misdemeanor; and thirty days for following too closely, a Class C misdemeanor. The trial court ordered that she serve the six- and four-year sentences consecutively for a total effective sentence of ten years in confinement.

## ANALYSIS

### I. Expert Testimony

The Defendant claims that the trial court abused its discretion by admitting Mr. Farmer's expert testimony because Mr. Farmer's method of data collection was unreliable. The State argues that the trial court did not abuse its discretion. We agree with the State.

Before trial, the Defendant filed a motion to exclude Mr. Farmer's testimony, asserting that his use of a drag sled to determine the friction value of the roadway, and consequently the Volkswagen's speed, was not a scientifically reliable method of data collection in the field of accident reconstruction. At the hearing on the motion, Mr. Farmer testified for the State that he worked as a police officer for thirty-two years and completed his training in accident reconstruction in 1996. He said that his education in accident reconstruction included two eighty-hour training courses in crash reconstruction and that he had been qualified to testify as an expert in crash reconstruction "[m]any times." Mr. Farmer said that he had been a member of the National Association of Professional Accident Reconstruction Specialists since 1996; that he was a member of and was serving on the board of directors for the National Association of Traffic Accident Reconstruction Investigators; and that he was serving on the governing board of directors for the Accreditation Commission for Traffic Accident Reconstruction, also known as "ACTAR." He stayed informed about developments in the field of accident reconstruction and taught accident reconstruction training courses in basic collision, advanced collision, crash reconstruction and investigation, and mapping.

Mr. Farmer testified that after the State retained him to investigate the crash, he reviewed the evidence and inspected the crash scene. In order to determine the Volkswagen's speed at the time of impact, he needed to know the length of the tire marks and the friction value of the roadway. He described "friction value" as "the slipperiness between two objects," with the "objects" in this case being the asphalt roadway and the vehicles' tires.

Mr. Farmer testified that he used a drag sled to obtain the friction value of the roadway. He described the design of his drag sled for the trial court, stating,

- 13 -

> My sled is a -- it weighs 42 pounds, has a tire mounted on the bottom of it, and it has an eye bolt, which I hook a spring scale to . . . pull on the roadway. And it's used -- use the horizontal force and vertical force to calculate the friction value.

On February 21, 2023, he went to the crash scene and pulled his drag sled in the far-right lane, which was the lane in which the crash occurred. The tire marks were no longer present on the pavement, so he used a scale diagram to obtain the lengths of the marks. Mr. Farmer said he "had to jump in and out between traffic -- breaks in traffic" to collect his data.

Mr. Farmer testified that the friction value also could be obtained by conducting "test skids" with a Vericom computer and an exemplar vehicle. He explained that the Vericom computer was mounted onto the windshield area of the exemplar vehicle and determined the friction value based on the time and distance required for the exemplar vehicle to come to a stop. Mr. Farmer said that he could have used a Vericom computer to determine friction value in this case, but that, in his professional opinion, a drag sled was preferable over a Vericom computer "for safety and to keep from having to shut the interstate down." The trial court asked him if a Vericom computer was a reliable method to determine a vehicle's speed, and he said yes. The trial court asked him if a drag sled was a reliable method to determine speed, and he said yes.

Mr. Farmer testified that he was trained to weigh his drag sled before every use and to pull his drag sled through the center mass at a constant rate to obtain the average pull force. The State asked him if drag sled results had been "scientifically scrutinized," and he answered, "A lot." He said that publications were "about 50/50" in approval of drag sleds and that "[s]ome people disagree with the publication[s]. Some people agree with them."

Mr. Farmer testified that drag sleds had a margin of error of two to three percent. He acknowledged that in order to account for the margin of error, he estimated a vehicle's speed "on the more conservative or slower side." The State asked if he had conducted any research or experiments with drag sled testing apart from litigation, and he answered, "Several times." The State asked if he had compared drag sled testing to other methods for calculating a vehicle's speed, and he responded,

> Yes. I've used the Vericom computer to verify the drag sled results, test skids, where we take the car to known -- up to known speed, slide and lock it up, measure the tire marks to get a friction value. I've compared it with published data, which is multiple charts that's put out by different

- 14 -

organizations. And they all have failed -- as long as you do the procedure correctly, it'd be plus or minus about .03 -- .02 to .03 on all the data that I've done, got very good acceptable responses.

He said his speed calculations with the drag sled also were "[v]ery accurate" when compared to speeds obtained via radar. The trial court asked him, "Is the drag sled test still an accepted means within your field of expertise to test the friction value of a road?" Mr. Farmer said yes.

Mr. Farmer testified that he reviewed Mr. Norris's crash report and that Mr. Norris used "a friction value of about .43 to about a .59, which that's fairly low for that type of road." After reviewing Mr. Norris's report, Mr. Farmer prepared a supplemental crash report and attached excerpts from accident reconstruction literature to support his use of the drag sled to obtain the friction value. He said that according to the excerpts, drag sleds provided "acceptable results."

The State introduced into evidence Mr. Farmer's curriculum vitae; Mr. Farmer's original crash report; Mr. Norris's report; and Mr. Farmer's supplemental report, including the published excerpts he attached in support of drag sleds. In the first excerpt, which was photocopied from *Fundamentals of Applied Physics for Traffic Accident Investigations* (Institute of Police Technology and Management, University of North Florida, 1997), authors Daily and Shigemura wrote:

> Drag sleds are easy to use. Care must be taken to ensure that they are pulled the same way each time. Each sled has its own angle of pull, which must be determined by trial and error, checking results against one of the other listed methods. Once the proper pull angle is achieved, repeatable results can be obtained. The use of drag sleds is best limited to dry, hard-surface roads that have no surface contaminants. Drag sleds will then give reasonably good values for the sliding friction coefficient.

In the second excerpt, which was photocopied from Lynn B. Fricke's *Traffic Accident Reconstruction*, *The Traffic Accident Investigation Manual* (Northwestern University Traffic Institute, 1990), Mr. Fricke wrote:

> There are different methods that can be used to devise a test by dragging a test tire. A whole tire and wheel can be used . . . . Another method is to use part of a tire and fill it with concrete . . . . Both methods are often criticized because the load on the tire is considerably less than what a normal passenger car tire will be carrying. It is generally accepted that the friction capability of a rubber tire on pavement tends to deteriorate as the load is

- 15 -

increased.  It is also argued that at typical skidding speeds, the tire is heated due to friction.  However, it is not expected that the heating of the pulled tire (or part of a tire) will have the same effect as the heating of a tire on a car that is being skidded.  Thus, it is generally expected that friction data collected in this manner should be reduced to reflect this.

If you are in a location where skidding a car is inherently dangerous, using a test tire could be appropriate.  Sliding a test tire might not be appropriate, however, on soft turf, loose gravel, or other soft surfaces.

Defense counsel began his cross-examination by asking Mr. Farmer a series of questions about how he calculated the Volkswagen's speed.  The trial court interrupted defense counsel and stated:

This may be a beautiful cross-examination in front of a jury as to -- to impeach his conclusions, but how does it speak to whether or not his testimony is admissible under [*McDaniel*] and [*Daubert*] on the scientific acceptability of the use of the drag sled within the reconstruction community?

. . . .

The purpose of this hearing is not to impeach him that [his] computations are wrong.  The purpose of this hearing is to say that you can't use -- as I understand your motion -- you can't use the drag sled as a valid means to ascertain her speed, correct?

. . . .

I don't see how it's germane.  I mean, the purpose of this hearing under [*McDaniel*] and [*Daubert*] is to say that this is not accepted within the scientific community, therefore, it's not admissible period.

Defense counsel said he would "move on."

Mr. Farmer testified that he did not disagree with Mr. Fricke's statement that the use of drag sleds was "often criticized."  Mr. Farmer acknowledged that in an excerpt from the 2010 edition of Mr. Fricke's book, Mr. Fricke went even further in his criticism of drag sleds by stating that the interaction between a tire and the roadway was not well-modeled by a drag sled and that the use of drag sleds was no longer recommended to determine friction value.  Mr. Farmer also acknowledged that the SAE disapproved of using a drag

sled to obtain friction values. He said that although Mr. Fricke's publications and the SAE were well-respected in the field of accident reconstruction, he disagreed with their opinions. However, he acknowledged that variables such as the speed and the weight of a vehicle affected friction value and that those variables could not be replicated by pulling a drag sled.

On redirect-examination, Mr. Farmer acknowledged that the error rate for drag sleds took into account the variables that affected friction value. He said he attached the excerpt from Mr. Fricke's 1990 book to his supplemental report because Mr. Fricke wrote that use of a drag sled was appropriate when conditions were too dangerous to use an exemplar vehicle.

On recross-examination, defense counsel asked Mr. Farmer to show where he applied the rate of error in his calculations for the Volkswagen's speed. Mr. Farmer said the rate of error was reflected in the number of pulls he conducted, not directly in his calculations. He said he did not know of any literature that expressly approved of drag sleds but that even Mr. Fricke said in his 1990 book that drag sleds should return acceptable results when pulled correctly.

Mr. Norris testified for the Defendant that he disagreed with the use of drag sleds to obtain friction values because "the science just flat doesn't support it anymore." He said that drag sleds were "a very accepted method" of data collection in the 1990s but that engineers, researchers, and many former police officers "have looked at this and determined that this is just not really a valid way" to collect a friction value. The trial court asked him, "In your judgment, how should it be done?" Mr. Norris recommended using a Vericom computer and an exemplar vehicle. He noted, though, that the exemplar vehicle had to be similar to the actual crash vehicle, which in this case was a 2007 Volkswagen Jetta. A reconstructionist also could obtain friction values from published data, i.e., charts that showed friction values for different types of surfaces, such as cement and asphalt, and different types of conditions for those surfaces, such as traveled and polished. Mr. Norris said he typically obtained friction values from published data rather than a Vericom computer because "a lot of work has [gone] in to developing those [charts]." In this case, Mr. Norris used published data to obtain the friction value of the asphalt roadway. The published data showed that the friction value of asphalt was .55 to .7. He noted that Mr. Farmer used a friction value of .7857, which resulted in Mr. Farmer's calculating a greater speed for the Volkswagen.

Mr. Norris acknowledged that an accident reconstructionist could use published data to obtain the range for a vehicle's speed but not a precise speed. Nevertheless, he considered speeds calculated with published data to be more reliable than speeds calculated with drag sleds. Addressing the 1997 excerpt attached to Mr. Farmer's supplemental

report, Mr. Norris said the use of drag sleds was still approved when the excerpt was published. Subsequently, though, the opinion regarding drag sleds changed. Mr. Norris said the SAE was "immensely important" to the accident reconstruction field because the SAE conducted and published a large amount of research. The SAE no longer considered drag sleds a reliable method of data collection, and Mr. Norris did not know of any published scientific studies to dispute the SAE's disapproval. Mr. Norris acknowledged that drag sleds produced greater friction values, and consequently greater speeds, than published data. Defense counsel asked Mr. Norris to summarize his expert opinion on the use of drag sleds, and he stated, "Avoid it. Leave it alone. . . . Because it's not reliable."

Upon being questioned by the trial court, Mr. Norris reiterated that he preferred to use a Vericom computer to obtain friction values. He said that if he could not locate an exemplar vehicle, he used published data "most of the time."

On cross-examination, Mr. Norris acknowledged that accident reconstructionists accredited by ACTAR continued to use drag sleds and that ACTAR did not revoke their accreditation for doing so. He also acknowledged that published data showed two ranges for the friction value for dry, traveled asphalt: .55 to .70 and .6 to .8. Mr. Farmer's drag sled produced a friction value within the second range. Mr. Norris explained that the .55 to .70 range was for vehicles traveling more than forty miles per hour and that the .6 to .8 range was for vehicles traveling less than forty miles per hour. He said that because the vehicles in this case were traveling at interstate speeds, the correct range for friction value was .55 to .70.

The trial court denied the Defendant's motion to exclude Mr. Farmer's testimony, stating,

> You know, I've got two men who are well qualified in this field, who have each testified, who are each offering differing opinions about drag sled testing, I'm not an accident reconstructionist. I'm going to allow the testimony in.
>
> By the same token, obviously, there's some issue that's being raised, and I think that there will be the opportunity for impeachment, if in fact this hasn't been an approved method of testing or it's not the approved method of testing for the last 15 or 20 years.
>
> Both experts seem to agree that the Vericom would be the best way, if it's feasible to do so, if everything lines up with the right exemplar vehicle under the same conditions to get the test.

. . . .

Do it how you want to, gentlemen. I would suggest the roadway is still up there. There's still 2007 Jettas out and about, do it how you want to.

But I'm going to allow the testimony in. It's subject -- it's two experts. I can't do anything more than say this will be a battle of experts when we try it.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The Rule provides that expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." *Id.*

In *McDaniel. v. CSX Transp., Inc.*, our supreme court set forth the following list of factors for determining the reliability of scientific evidence:

(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by [*Frye v. United States*, 293 D.C. Cir. 1923)], the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d 257, 265 (Tenn. 1997). "Rigid application of the *McDaniel* factors is not required." *State v. Copeland*, 226 S.W.3d 287, 302 (Tenn. 2007). "[T]heir application in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016).

- 19 -

The trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. *See State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

The Defendant contends that the trial court erred in admitting Mr. Farmer's testimony because the trial court relied on Mr. Farmer's qualifications rather than considering the factors in *McDaniel* for determining the reliability of Mr. Farmer's scientific evidence. We disagree. Although the trial court did not make sufficient findings under *McDaniel*, the trial court did not abuse its discretion in admitting Mr. Farmer's testimony.

Regarding the first factor, whether the scientific evidence has been tested and the methodology with which it has been tested, the Defendant claims that the only proof offered by Mr. Farmer as to the validity of drag sled testing was his own comparisons of his results to other methods. However, Mr. Farmer testified that drag sled results had been scientifically scrutinized "a lot." The literature attached to Mr. Farmer's supplemental report confirms that the use of drag sleds to obtain friction values has been tested.

Regarding the second *McDaniel* factor, whether the evidence has been subject to peer review or publication, Mr. Farmer testified that about fifty percent of publications agreed with the use of drag sleds, and he attached two publications in support of drag sleds to his supplemental report. Mr. Fricke stated in his 1990 publication that the use of drag sleds "could be appropriate' in locations where it was too dangerous to use an exemplar vehicle and the surface was not soft. We note that in this case, Mr. Farmer used his drag sled on a dry, hard surface because it was too dangerous to use an exemplar vehicle. On cross-examination, Mr. Farmer acknowledged that Mr. Fricke and the SAE no longer recommended using drag sleds to obtain friction value. Thus, the record shows that the evidence has been subject to peer review or publication.

As to the third factor concerning the rate of error, Mr. Farmer testified that the rate of error for drag sleds was two to three percent and acknowledged that he estimated speeds on the "slower side." As to the fourth factor, whether the evidence is generally accepted in the community, Mr. Farmer testified that he stayed informed about developments in the field of accident reconstruction; that he taught students about crash reconstruction and investigation; and that, in his professional opinion, a drag sled was the best method for obtaining the friction value in this case. The trial court asked him if drag sleds were a reliable method for calculating friction value and if drag sleds were still an accepted means to test friction value within the field of accident reconstruction, and he answered both questions in the affirmative.

As to the final factor, whether the expert's research in the field has been conducted independent of litigation, the State specifically asked Mr. Farmer if he had conducted research testing independent of pending court cases, and he said, "Several times." He explained that he had compared speeds calculated with his drag sled to speeds calculated with a Vericom computer and to speeds calculated with published friction values and that his speeds were always within two to three percent of the speeds calculated with the other methods. He also said his speeds were "very accurate" when compared to speeds obtained by radar. Thus, although the accident reconstruction community disagreed about the use of drag sleds to obtain friction value, the Defendant has not shown that this type of evidence would not substantially assist the trier of fact/jury. Therefore, we conclude that the trial court did not abuse its discretion in admitting Mr. Farmer's expert testimony.

## II. Jury Instructions

The Defendant claims that the trial court erred by denying her request for special jury instructions concerning the definition of "recklessly" for the offense of vehicular homicide and the definition of "report" for the offense of initiating a false report. The State argues that the trial court did not err in instructing the jury. We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An erroneous jury instruction may deprive the defendant of his constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). An instruction will be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *Id.* (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

"The purpose 'of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury.'" *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (quoting *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001), *overruled on other grounds by State v. White*, 362 S.W.3d 559 (Tenn. 2012)). "A trial court's refusal to grant a special instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citations omitted). We review the propriety

of the jury instructions de novo with no presumption of correctness. *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017).

## A. Vehicular Homicide

The Defendant claims that the trial court erred by failing to give a special jury instruction relating to the definition of "recklessly" for the offense of vehicular homicide. As charged in this case, vehicular homicide is "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [c]onduct creating a substantial risk of death or serious bodily injury to a person[.]" Tenn. Code Ann. § 39-13-213(a)(1). A person acts recklessly "with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur[,]" and "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id*. § 39-11-302(c).

The Defendant requested that the trial court instruct the jury that "[a] 'gross deviation from the standard of care' requires more than a showing that the defendant was inattentive, inadvertent, or failed to exercise due or reasonable care." In support of her request, the Defendant relied on *State v. Briggs*, in which this court concluded that the evidence was insufficient to support the defendant's conviction of criminally negligent homicide. 343 S.W.3d 106, 111 (Tenn. Crim. App. 2010).[1] "Criminal negligence" requires that a defendant fail to perceive a substantial and unjustifiable risk and that the failure to perceive the risk "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-302(d); *Briggs*, 343 S.W.3d at 11. In *Briggs*, this court held that in order to show "a gross deviation from the standard of care" in the context of a motor vehicle accident, the evidence must show "more than a 'mere[] want of due care, inadvertence, or inattention.'" 343 S.W.3d at 110 (quoting *Roe v. State*, 358 S.W.2d 308, 314 (Tenn. 1962)). Although *Briggs* was a criminally negligent homicide case, this court has also stated that "an accused is not guilty of vehicular homicide [by recklessness] if the evidence establishes that the accused's conduct merely constituted a want of due care, inadvertence, or inattention." *State v. Gose*, No. 03C01-9406-CR-00244, 1996 WL 30992, at *3 (Tenn. Crim. App. Jan. 29, 1996).

---

[1] In its brief, the State contends that "[t]his Court has previously held that it was not error to decline to issue a special jury instruction pursuant to *Briggs*. *State v. Stewart*, No. E2015-00820-CCA-R3-CD, 2016 WL 6087654, at *10-11 (Tenn. Crim. App. Oct. 18, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017)." However, our supreme court designated *Stewart* "Not for Citation." Pursuant to Rule 4(E)(1), Rules of the Supreme Court of Tennessee, opinions designated not for citation have no precedential value.

The trial court denied the Defendant's request for the special instruction and gave the standard, pattern instruction for vehicular homicide by recklessness:

> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant killed Gary Rosen by the operation of a motor vehicle; and
>
> (2) that the defendant acted recklessly; and
>
> (3) that the killing was the proximate result of conduct creating a substantial risk of death or serious bodily injury.

*See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 7.08(a) (25th ed. 2021). The trial court defined "recklessly" as follows:

> Recklessly means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.
>
> The requirement of recklessly is also established if it is shown that the defendant acted knowingly or intentionally.

Turning to the instant case, the Defendant's requested instruction was a correct statement under *Briggs*. However, the trial court gave the pattern instruction for vehicular homicide, which accurately provided the elements of the offense and correctly defined "recklessly." Therefore, the trial court did not err by refusing to give the requested instruction.

### B. Initiating a False Report

The Defendant claims that the trial court erred by refusing to give a special instruction on the word "report" in the offense of initiating a false report. Relevant to this case, Tennessee Code Annotated section 39-16-502 provides,

(a) It is unlawful for any person to:

> (1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

>> (A) The offense or incident reported did not occur;

>> (B) The person has no information relating to the offense or incident reported; or

>> (C) The information relating to the offense reported is false; or

> (2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from:

>> (A) Preventing the offense or incident from occurring or continuing to occur; or

>> (B) Apprehending or locating another person suspected of committing an offense[.]

In this case, the presentment alleged that the Defendant "did unlawfully initiate a report to an officer of Knoxville Police Department, concerning an offense within the officer's concern, knowing that the information relating to the offense was false." Accordingly, the presentment charged the Defendant with initiating a false report under Tennessee Code Annotated section 39-16-502(a)(1)(C).

The Defendant requested that the trial court instruct the jury, "A 'report' is a written or oral statement initiated by a person, not a response to an inquiry by a law enforcement officer." The Defendant asserted that the instruction was warranted by *State v. Levandowski*, in which the defendant was charged and convicted of making a false report for lying to a police officer who had come to her home to investigate a report of suspected child abuse. 955 S.W.2d 603, 604 (Tenn. 1997). At that time, the false reports statute provided, in pertinent part, that it was "unlawful for any person to . . . [r]eport to a law enforcement officer an offense or incident within the officer's concern . . . [k]nowing the

offense or incident did not occur." Tenn. Code Ann. 39-16-502(a)(1)(A) (1997). Our supreme court held that the term "report" applied "in contexts where the individual initiates the provision of the information, not in contexts where an individual is responding to an inquiry." *Levandowski*, 955 S.W.2d at 605. Our supreme court has noted that based on the holding in *Levandowski*, the Tennessee Legislature amended the false reports statute in 1998 to its current form, which criminalizes two distinct types of conduct: initiating a false report or statement to a law enforcement officer in subsection (a)(1) and making a false report or statement in response to a legitimate inquiry by a law enforcement officer in (a)(2). *State v. Smith*, 436 S.W.3d 751, 769-770 (Tenn. 2014).

The trial court denied the Defendant's requested instruction on "report" because the Legislature addressed the issue in *Levandowski* by amending the statute. During the final jury charge, the trial court gave the following instruction for initiating a false report, which was almost identical to the pattern instruction for the offense:

Any person who initiates a false report or statement to a law enforcement officer is guilty of a crime.

For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant initiated a report to a law enforcement officer concerning an offense or incident within the officer's concern;[2] and

(2) that the defendant knew the information relating to the offense reported was false.

*See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 26.01(a) (25th ed. 2021).

Here, the pattern instruction given by the trial court accurately provided the elements of the offense for the crime charged. Moreover, we agree with the trial court that the requested instruction was unnecessary in light of the Legislature's amending the statute to distinguish between a defendant's initiating a false report and a defendant's making a false report in response to an officer's inquiry. Therefore, the trial court did not err by denying the requested instruction.

---

[2] The trial court omitted "or statement" from the first element of the offense because the presentment only alleged that the Defendant initiated a false report, not a false report or statement.

- 25 -

### III. Sufficiency of the Evidence

Finally, the Defendant claims that the evidence is insufficient to support her conviction of initiating a false report because the proof fails to show that she "initiated" the report. She acknowledges that she lied to Officer Black about who was driving the Volkswagen. However, she notes that Officer Black already knew about the report when he approached her at the scene and that the State failed to present any proof that she "initiated a report to a KPD officer first." The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As stated previously, the presentment charged the Defendant with initiating a report to a law enforcement officer concerning an offense or incident within the officer's concern knowing that the information relating to the offense reported was false. Tenn. Code Ann. § 39-16-502(a)(1)(C). In *State v. Montgomery*, the defendant falsely reported to a hotel clerk that he had been robbed. No. M2019-00757-CCA-R3-CD, 2020 WL 2844531, at *1 (Tenn. Crim. App. June 1, 2020), *perm. app. denied* (Tenn. Sept. 16, 2020). The hotel

clerk called 911 and handed the telephone to the defendant, who reported the robbery to 911 dispatchers. *Id*. When police officers arrived, the defendant also falsely reported the robbery to them. *Id*. A jury convicted the defendant of initiating a false report. *Id*. at *6. On appeal of his conviction to this court, the defendant claimed that he did not initiate the false report because the hotel clerk notified 911. *Id*. This court disagreed, concluding that the evidence was sufficient to support the conviction because the defendant told the hotel clerk and the dispatcher that he had been robbed and then repeated his story about the alleged robbery to police officers when the officers arrived on the scene. *Id*. at *7. Subsequently, in *State v. Fletcher*, this court stated that "*Montgomery* stands for the unremarkable proposition that when a defendant makes a false report to a law enforcement officer, even after making a similar report to non-law enforcement persons, the defendant may be subject to criminal liability under section 39-16-502(a)(1)." No. E2022-01319-CCA-R3-CD, 2024 WL 4274212, at *6 (Tenn. Crim. App. Sept. 24, 2024), *perm. app. denied* (Tenn. Feb. 20, 2025).

Taken in the light most favorable to the State, the evidence shows that the Defendant telephoned Mr. Brooks after the crash. She asked him what she should do, and he told her to tell the police that "Corey Huffaker" was driving. The Defendant obviously told someone at the scene that her boyfriend was driving the Volkswagen because Officer Black, having not spoken with the Defendant, approached her and asked, "What's up? Where's your boyfriend?" The Defendant then repeated her claim to the officer. Therefore, we conclude that a reasonable jury could have found beyond a reasonable doubt that the Defendant initiated a false report to a law enforcement officer. The evidence is sufficient.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE

- 27 -